PEGGY S. KUMPF,

      **Plaintiff,**

vs.                                **Civil Action No. 2:05CV13**
                                    **(The Honorable Robert E. Maxwell)**

JO ANNE B. BARNHART,
Commissioner of Social Security,

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Peggy S. Kumpf ("Plaintiff") filed an application for DIB on March 6, 2003, alleging disability since February 21, 1998, due to osteoarthritis, fibromyalgia, and spurs on the left knee and heel (R. 57-59, 78). Plaintiff's applications were denied at the initial and reconsideration levels (R. 37-38). Plaintiff requested a hearing, which Administrative Law Judge Karl Alexander ("ALJ") held on May 20, 2004 (R. 14, 247). Plaintiff, who was assisted at the hearing by Andrea Pecora, a non-attorney representative, testified on her own behalf (R.249-65). Also testifying was William Kumpf, Plaintiff's husband, and Vocational Expert Larry Ostrowski ("VE") (R. 265-68, 268-75). On September 3, 2004,

the ALJ entered a decision finding Plaintiff was not disabled (R. 14-25). On December 10, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-6).

## II. STATEMENT OF FACTS

Plaintiff was born on February 1, 1961, and was thirty-seven (37) years old at the initially-asserted onset date of February 1998 (R. 57)[1]. Plaintiff was forty-three (43) years old at the time of the administrative hearing (R. 15). Plaintiff completed LPN school and two (2) years of college (R. 84, 252). Plaintiff's past relevant work included that of a licensed practical nurse (R. 79).

On April 8, 1996, Sally H. Swisher, M.D., completed an electromyography and nerve conduction study of Plaintiff. The results were "consistent with mild right sided carpal tunnel syndrome" (R. 121). On April 11, 1996, Dr. Swisher, in a letter to Mason T. Corder, D.O., wrote Plaintiff had numbness and tingling in her hands, had decreased grip strength, complained of depression, was obese, took Prozac and Buspar, was "positive for Tinel's sign on the right over the right median nerve," and had borderline nerve conduction study results. Dr. Swisher opined Plaintiff had carpal tunnel syndrome and recommended "conservative treatment with a splint" (R. 120).

On March 12, 1998, Plaintiff underwent a left leg venogram due to edema and left knee swelling. The study revealed Plaintiff's "deep venous system [was] patent and no DVT [was] seen" (R. 118).

---

[1]Plaintiff's original onset date of February 21, 1998, was amended by the ALJ based on testimony presented by Plaintiff at the administrative hearing (R. 269-72). The ALJ, in his decision, found "[t]he overall record establishes that [Plaintiff] performed substantial gainful activity until June 28, 2001. Pursuant to 20 CFR 404.1520(b), the claimant cannot be found disabled prior to June 28, 2001. The evidence of record fails to establish that the claimant performed any substantial gainful activity after June 28, 2001" (R. 15).

On August 3, 1998, Plaintiff reported to the neurology department at University Health Associates and was examined by Jack E. Riggs, M.D. Plaintiff informed Dr. Riggs that she had been involved in an automobile accident on February 25, 1998. Plaintiff stated she had noticed numbness on the right side of her body, facial weakness and numbness, and numbness at the back of her neck since April, 1998. Plaintiff stated she had "recently" experienced dizziness, difficulty "concentrating on her job," stumbling, blurred vision in the morning, elbow pain, knee pain, and weak grip. Plaintiff informed Dr. Riggs that she had "trouble with tremors," which she attributed to "nervousness" (R. 133).

On August 7, 1998, Dr. Riggs corresponded with Dr. Corder about his August 3, 1998, evaluation of Plaintiff. He opined Plaintiff's MRI showed "one small focus of white matter" which did not make him "suspect that this would be indicative of multiple sclerosis." Dr. Riggs further opined that Plaintiff had "no focal neurologic abnormalities or other neurologic findings that would suggest an underlying diagnosis of multiple sclerosis." Dr. Riggs informed Dr. Corder that the EMG study of Plaintiff "showed a very minimal or borderline prolonged distal latency on the right median nerve." Dr. Riggs concluded the correspondence by writing that he "certainly would not suspect that [Plaintiff] has multiple sclerosis" (R. 132).

On February 6, 1999, Plaintiff was evaluated at University Health Associates. She complained of pain and discomfort in her back and extremities; numbness and tingling in her neck, feet, and legs; blurred vision; tiredness; headaches; her arms giving out; stumbling; and occasional knee swelling (R. 126-27).

On March 26, 1999, Dr. Corder examined Plaintiff, who stated her "feet, back and legs hurt" and that she felt numbness. He assessed multiple myalgias and paresthesias (R. 205).

3

On April 27, 1999, Plaintiff was examined by Dr. Corder. Her lungs were clear, heart rage and rhythm were regular, blood pressure was 120/70, and upper and lower extremity reflexes were equal and symmetrical. Plaintiff presented with "episodes of migratory paresthesias, no muscle weakness." Dr. Corder diagnosed paresthesias and neuropathy (questionable etiology) and possible multiple sclerosis and prescribed Prednisone and Neurontin (R. 204).

On July 7, 1999, Joseph Steffl, physician's assistant to Dr. Corder, examined Plaintiff. Her weight was 280 pounds; blood pressure was 140/90; EKG showed normal sinus rhythm; ENT was within normal limits; extremities were without edema and cyanosis; upper and lower extremity pulses were present and equal; sensation was intact; no muscle weaknesses in upper or lower extremities; and no muscle atrophy. Plaintiff stated the prescribed Neuronton was "helping the lower extremities," but that she experienced paresthesias in her upper extremities. Plaintiff informed P.A. Steffl that she had difficulty lifting and pulling her patients sometimes and that she was experiencing weakness within her hands. Plaintiff also stated she was pain free and not experiencing any difficulties with her hands. P.A. Steffl diagnosed possible continuation of carpal tunnel "versus questionable etiology of MS with paresthesias and neuropathy." P.A. Steffl recommended Plaintiff undergo a consultative examination by Dr. Swisher (R. 203).

On July 26, 1999, Dr. Swisher corresponded with Dr. Corder. She wrote that she had examined Plaintiff on July 23, 1999, that Plaintiff was experiencing "a lot of neck pain which radiates down her back," that Plaintiff had undergone an MRI and EMG, that Plaintiff had had a consultative examination with Drs. Gutmann and Riggs, and that Neurontin and Prednisone had "definitely helped her paresthesias." Dr. Swisher provided samples of Vioxx to Plaintiff for treatment of neck pain (R. 119).

4

On July 28, 1999, Plaintiff was examined by Dr. Corder, who reported Plaintiff presented with no weakness, no rash, but continued neuropathy (R. 202).

On October 13, 1999, Plaintiff returned to Dr. Corder for an employment physical. Plaintiff reported to Dr. Corder that she had been having some swelling. Dr. Corder continued Plaintiff's prescriptions for Neurontin and Vioxx (R. 201).

On December 6, 1999, Plaintiff was evaluated by Jo Ann Allen Hornsby, M.D., of the University Health Associates, to "rule out lupus" (R. 123). Plaintiff informed Dr. Hornsby that she experienced "pain all over mainly back, neck, arms & hands." Plaintiff did not present with swelling, but stated fatigue had increased during the past six (6) months. Plaintiff's medications were noted as Aldomet 25mg, Vioxx 50mg, Prilosec 20mg, and Elavil 10mg. Dr. Hornsby's review of Plaintiff's systems revealed no rashes; occasional double vision, which "comes & goes"; "problems with swallowing," which "comes & goes"; numbness at the back of neck, which "comes & goes"; and no diaphoresis (R. 124). Dr. Hornsby found Plaintiff had "muscle and joint pain without evidence of inflammatory arthritis or clear diagnosis of lupus." Additionally, Dr. Hornsby found "no clear evidence of rheumatology disease" and could not "make a diagnosis of fibromyalgia," even though Plaintiff did not sleep well and presented with "a few tender points" (R. 123).

On February 18, 2000, Plaintiff returned to Dr. Corder for a follow up examination. Plaintiff stated she experienced arm numbness and weakness (R. 200).

On October 26, 2000, Plaintiff was examined by Dr. Corder. She presented with numbness in her right foot. Dr. Corder assessment was for fibromyalgia (R. 198).

On March 16, 2001, Plaintiff presented to Dr. Corder with pain in both legs, back pain, and spider bites. Dr. Corder observed Plaintiff had right leg pain, sciatic pain in left leg, back pain, and "slight calf edema" (R. 197).

5

On March 30, 2001, Plaintiff returned to Dr. Corder as a follow-up to her March 16, 2001, examination. Dr. Corder opined Plaintiff continued to experience back and leg pain and noted Plaintiff had been sleeping "better" with the "addition to Flexeril" to her medication regimen. Dr. Corder assessed "resolved" spider bites, low back pain, fibromyalgia, and mild calf edema. Dr. Corder recommended stretching exercises for Plaintiff's low back, walking, and that Plaintiff join a fibromyalgia support group. He prescribed Vioxx and Flexeril (R. 197).

On June 26, 2001, Plaintiff was again examined by Dr. Corder for complaints of bone spur and leg swelling. Plaintiff informed Dr. Corder that her "leg didn't want to work"; that she had reported to the "Tucker Co. Amb. Center" for treatment of her leg; and that an x-ray taken during that visit revealed bone spurs. Plaintiff's blood pressure was 160/102 and her weight was 325 pounds. Dr. Corder diagnosed "+1 - +2 pitting edema in both lower legs," job stress, anxiety, hypertension, and obesity. Dr. Corder ordered laboratory testing for, provided a Zpack to, prescribed Vistaril to, and discussed weight loss with Plaintiff (R. 196).

On July 20, 2001, Plaintiff returned to Dr. Corder with complaints of depression. Plaintiff stated she felt "hopeless, tearful," her desire to sleep had increased, and her former employer had been "fighting her on her unemployment." Plaintiff denied suicidal or homicidal ideations. Dr. Corder observed that Plaintiff held direct eye contact, was insightful, and tearful at times (R. 196). Plaintiff completed a questionnaire on which she noted the following: she 1) felt best in the mornings, enjoyed talking to or looking at or being with attractive women/men, was constipated, had a clear mind, found it easy to do the things she used to do, felt hopeful about the future, found it easy to make decision, felt useful and needed, felt her life was pretty full, and still enjoyed the things she used to none of the time; 2) was restless and felt that others would be better off if she were dead some of the time; 3) had

6

trouble sleeping through the night a good part of the time; and 4) felt downhearted and blue, had crying spells, ate as much as she used to, got tired for no reason, and was more irritable most of the time (R. 195). Based on the responses to these questions, Plaintiff's statements to Dr. Corder, and Dr. Corder's observation of Plaintiff, Dr. Corder diagnosed severe depression and situational anxiety. He discussed counseling options with Plaintiff, prescribed Wellbutrin and Vistaril, and advised Plaintiff to return in one (1) month (R. 196).

On August 20, 2001, Plaintiff presented to Dr. Corder with low back pain and urinary spasm and burning. She informed Dr. Corder that the antidepressant he had prescribed was "helping some." Her blood pressure was 158/100. Dr. Corder assessed urinary tract infection, uncontrolled hypertension, and depression under treatment with medication. Dr. Corder prescribed Macrobid 100mg and Wellbutrin, which was increased to 150mg (R. 194).

On September 5, 2001, Plaintiff was examined by Dr. Corder. Plaintiff's blood pressure was 160/80. He assessed uncontrolled hypertension and hematuria. Dr. Corder prescribed Tenormin 50mg for Plaintiff's hypertension and ordered Plaintiff's urine be recultured (R. 194).

On October 19, 2001, Plaintiff presented with restless legs and depression to Dr. Corder. Plaintiff's blood pressure was 130/90; she stated she was stressed at home; and she informed Dr. Corder the Wellbutrin was "not working." Dr. Corder observed Plaintiff's affect to be flat and that she was "tearful at times." Dr. Corder assessed hypertension, borderline controlled; depression; and restless legs. He prescribed Zoloft, recommended Plaintiff begin taking vitamin B, and instructed Plaintiff to return in six (6) weeks or sooner, if necessary (R. 193).

On December 14, 2001, Plaintiff returned to Dr. Corder with complaints of low back and side pain and burning with urination. Plaintiff's blood pressure was 120/78, she made direct eye contact,

and she was not tearful. Dr. Corder assessed depression and urinary tract infection. He continued Plaintiff's medications and instructed Plaintiff to return in three (3) months (R. 193).

On March 8, 2002, Plaintiff did not attend an appointment with Dr. Corder. Plaintiff returned to Dr. Corder on May 6, 2002, with complaints of congestion, ear pain, and low back pain. Plaintiff's blood pressure was 120/80. Dr. Corder observed Plaintiff's nasal mucus was inflamed, her post nasal drip was "yellow," her neck was supple, and hematuria in her urine. He diagnosed sinusitis and urinary tract infection, prescribed Allegra, and provided samples of Avelox (R. 192).

On January 15, 2003, Plaintiff presented to Dr. Corder with complaints of aching "all the time." She reported she thought she had had a panic attack and was more depressed. Plaintiff's blood pressure was 140/82 and her weight was 322 pounds. Dr. Corder noted Plaintiff had back pain, leg pain, and stiff arms and could walk for short distances. Dr. Corder assessed fibromyalgia and hypertension. He increased Plaintiff's intake of Zoloft to 100mg from 30mg (R. 191).

On April 28, 2003, Sharon Joseph, Ph.D., a psychologist, completed a Mental Status Exam of Plaintiff. Plaintiff informed Ms. Joseph that she had received grades of A's and B's while in high school. Plaintiff stated she had been employed as a certified nursing assistant and a licensed practical nurse. Plaintiff stated she "organized and opened the Dementia Unit for Colonial Place, in Elkins, West Virginia, and was the unit's coordinator until June 28, 2001, when she was replaced as coordinator by a registered nurse. Plaintiff informed Ms. Joseph she "was very devastated by this, as she . . . had not [been] advised ahead of time that this would be the case" (R. 138).

In evaluating Plaintiff's mental status, Ms. Joseph observed Plaintiff to be alert, oriented "x3," and cooperative. Plaintiff stated her sleep was disturbed; her mood was depressed; and she had no suicidal and/or homicidal ideations, hallucinations, delusions, preoccupations, obsessions, or

compulsions. Plaintiff presented with no limitations relative to her speech or hearing. She stated she had difficulty walking long distances because of pain from fibromyalgia and difficulty with dexterity because of pain in her hands. Plaintiff informed Ms. Joseph she had difficulty standing for "any great length of time" because of back pain and that arthritis caused swelling in her back and legs. Ms. Joseph noted Plaintiff's motor activity was somewhat nervous, posture was appropriate, eye contact was average, language usage was normal, speaking speed was normal, and content of speech was relevant. Ms. Joseph noted no psychomotor disturbances, a labile affective expression, and fair insight (R. 139). Plaintiff's judgment was within normal limits; Plaintiff's concentration was mildly impaired; and Plaintiff's immediate memory was within normal limits, recent memory was moderately impaired, and remote memory was within normal limits (R. 140).

Plaintiff reported her activities of daily living were as follows: she rose at 6:45 a.m., walked dog, awoke her children, took children to school, cleaned house, completed laundry, cooked dinner, washed dishes, spent time with her family, and retired at 10:00 p.m. More specifically, Plaintiff stated she cooked meals, cleaned the bathroom, made the bed, vacuumed with frequent stops, took out garbage, drove a car, generally remembered to turn off the stove, walked stairs with difficulty, shopped for groceries if another carried her purchases, but lacked "desire and energy to do much during the day" because of depression. Plaintiff reported she attended church three (3) or four (4) times per week, read, spent time with her family, but no longer made craft objects because of lack of interest and arthritis and fibromyalgia pain (R. 140).

Ms. Joseph diagnosed the following: 1) Axis I – major depression, recurrent, moderate and pain disorder with physical and psychological features; 2) Axis II – deferred; 3) Axis III – fibromyalgia, osteoarthritis, hypertension, gastro esophageal reflux disease (GERD), spurs on right

knee and heel as per Plaintiff's report. Plaintiff's psychological prognosis, according to Ms. Joseph, was "fair to good with psychotherapy and psychiatric treatment for depression." It was noted Plaintiff could manage her benefits (R. 140).

On May 7, 2003, Plaintiff underwent an Internal Medicine Examination, which was conducted by Kip Beard, M.D. Plaintiff's chief complaints were for osteoarthritis, fibromyalgia, left knee pain, heel pain, and hypertension (R. 142). Dr. Beard's physical examination of Plaintiff revealed she was five feet, five inches tall and weighed 313 pounds. Her blood pressure was 138/96. He noted Plaintiff was moderately to severely obese, stood unassisted, ambulated with a normal gait, experienced a mild degree of difficulty when stepping up or down from the examination table, was comfortable while seated, experienced mild discomfort in her back while in supine position, spoke understandably, and heard and followed instructions without difficulty (R. 144).

Plaintiff's head, ears, eyes, neck, throat, chest, heart, and abdomen were normal. Trace lower extremity edema was noted by Dr. Beard in his examination of Plaintiff's extremities, but it was without stasis, pigmentation, ulceration, or significant varicosities. Plaintiff's cervical spine examination revealed "some pain with range of motion testing, some paravertebral tenderness without spasm" and normal flexion. Plaintiff's extension was 45 degrees, lateral bending was 40 degrees bilaterally, and her rotation was normal (R. 144). Plaintiff's arms were tender, but her shoulders, elbows, and wrists were without redness, warmth, or swelling. Plaintiff's shoulder, elbow, and wrist ranges of motion were normal. Dr. Beard observed "some positive trigger points in the arms and around the shoulder girdle and neck" (R. 144-45). Plaintiff's hands, ankles, and feet were normal. Dr. Beard opined Plaintiff's knees revealed tenderness, genu valgus deformity, and moderate patellar crepitations. He observed no redness, warmth, swelling, effusion, or laxity of them. Flexion of both

knees was 95 degrees and extension was normal. Dr. Beard's examination of Plaintiff's spine and hips revealed mild pain with range of motion testing, paravertebral tenderness, and no spasms of the dorsolumbar spine. Plaintiff's seated straight-leg test was normal and supine was 75 degrees with back pain on either side. Plaintiff's hip flexion was 90 degrees on the right and 95 degrees on the left without tenderness. Plaintiff's neurologic examination was unremarkable except for the presence of a mildly positive right Tinel's sign at the wrist. Plaintiff was able to heel walk with pain, able to toe walk, able to heel-to-toe walk, able to squat halfway, and able to rise from a squat with some difficulty (R. 145).

Dr. Beard's impression was for fibromyalgia, by history; hypertension; chronic neck and back pain; chronic cervical and lumbar myofascial pain; bilateral knee pain with possible osteoarthritis and patellar subluxation; and exogenous obesity (R. 145). In summary, Dr. Beard opined Plaintiff's neck and back revealed "some mild motion loss, tenderness and pain with range of motion testing"; reflexes appeared symmetric; and knees revealed "some moderate patellar crepitations, genu valgus deformity and diminished flexion" (R. 146).

The May 7, 2003, x-ray of Plaintiff's lumbar spine showed normal alignment of the lumbar spine, no compression fracture or subluxation, normal interspaces and slight osteoarthritic changes of L1 and L2. The x-ray of Plaintiff's left knee taken on May 7, 2003, revealed a slight narrowing of the medial compartment, a marginal lipping of the lateral epicondyle of the femur, and moderate degenerative arthrosis of the knee (R. 147).

On May 13, 2003, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique form of Plaintiff. Mr. Roman found Plaintiff suffered from affective disorders, a medical impairment that was not severe (R. 148). The affective disorder listed by Mr. Roman was depression, which was

secondary to pain (R. 151). Mr. Roman found Plaintiff was mildly limited in her activities of daily living, able to maintain social functioning, and able to maintain concentration, persistence, or pace. Mr. Roman found Plaintiff had experienced no episodes of decompensation (R. 158).

On May 22, 2003, Fulvio Franyutti, M.D., a state agency physician, reviewed the medical evidence of record and completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of at least two (2) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 166). Dr. Franyutti found Plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl (R. 167). Plaintiff was found to have no manipulative, visual or communicative limitations (R. 168-69). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards; should avoid all exposure to heights; and was unlimited in her exposure to extreme heat, wetness, humidity, noise, and vibrations (R. 169).

On June 9, 2003, Plaintiff reported to Dr. Corder that she had been ill for three (3) days. Dr. Corder observed inflamed nasal mucus and infected pharynx and diagnosed pharyngitis. He prescribed Keflex 500mg to Plaintiff (R. 191).

On June 20, 2003, a second state agency physician agreed with the May 22, 2003, findings of Dr. Franyutti as to Plaintiff's limitations (R. 162-64).

On July 4, 2003, Plaintiff reported to Tucker Community Care with complaints of chest pain, with nausea, which radiated out over her upper chest and back and which lasted for fifteen (15) to twenty (20) minutes (R. 173, 175). Plaintiff's neck, respiratory system, cardiovascular system,

abdomen, rectal, skin, extremities, and neurological/psychological systems were unremarkable. The emergent care physician's impression was for atypical chest pain (R. 174). Plaintiff's blood pressure was 132/81. Nitroglycerin was administered to Plaintiff (R. 175). Plaintiff's electrocardiogram was borderline (R. 176). Plaintiff's chest x-ray was unremarkable (R. 177). Plaintiff was released with the following instructions: 1) activities as tolerated; 2) follow American Heart Association diet; 3) follow up examination by Dr. Corder within one (1) week; and 4) take Advil 800mg twice daily, Flexeril 10mg three (3) times per day, Tenormin 50mg once per day, Spirolactone 25mg once per day, Nexium 40mg at bedtime, Elevil 25mg at bedtime, and Zoloft 100mg once per day (R. 181).

On July 14, 2003, Plaintiff was examined by Dr. Corder as a follow-up to her discharge from Tucker Community Care. Plaintiff's blood pressure was 130/80. His assessment was for hair loss, chest pain, and GERD (R. 189).

On July 24, 2003, Dr. Corder completed a Medical Assessment of Ability to do Work-Related Activities (Physical) of Plaintiff. He found Plaintiff's ability to lift and carry was affected by her pain, stiff knees, low back pain, knees giving out, and falling. Dr. Corder found Plaintiff could lift and carry five (5) pounds for one (1) hour per day. Dr. Corder opined Plaintiff's ability to stand and walk was affected by her back pain and that Plaintiff could stand and walk for one (1) hour in an eight (8) hour workday for thirty (30) minutes without interruption (R. 184). Dr. Corder found Plaintiff's ability to sit was affected by her back pain and that she could sit for one (1) hour in an eight (8) hour workday for thirty (30) minutes without interruption. Dr. Corder opined Plaintiff could never climb, balance, stoop, kneel, or crawl due to back pain, morbid obesity, and knee pain. Because of Plaintiff's hand stiffness and pain, Dr. Corder found Plaintiff's ability to reach, handle, feel, push, and pull were affected, and he based this finding on his diagnosis of arthritis and fibromyalgia (R. 185). Dr. Corder

13

also found Plaintiff was restricted as to heights, moving machinery, humidity, and vibrations because she could not tolerate heat. In support of his assessment of Plaintiff's abilities and limitations, Dr. Corder noted the following as medical findings: 1) legs swelling; 2) leg pain; 3) hypertension; 4) cardiovascular disease; 5) obesity; and 6) knee pain (R. 186).

Plaintiff was examined by Dr. Corder on August 20, 2003. Her blood pressure was 132/80 and her weight was 309.5 pounds. Plaintiff stated she had experienced stomach queasiness and difficulty sitting for more than one (1) hour. Dr. Corder observed Plaintiff was morbidly obese, had hand stiffness, and presented with multiple myalgias. Dr. Corder diagnosed fibromyalgia and ordered a gynecological examination of Plaintiff (R. 189).

On August 25, 2003, Plaintiff underwent a gynecological test. Her blood pressure was 130/80 and her weight was 309 pounds. The examining physician opined Plaintiff appeared healthy; her neck was supple, her lungs were clear; her musculoskeletal range of motion was fully active; and her neurological system was grossly intact (R. 188).

On October 3, 2003, Thomas Lauderman, D.O., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry gen (10) pounds, stand and/or walk for at least two (2) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited (R. 207). Dr. Lauderman found Plaintiff could never climb ramps, stairs, ladders, ropes, or scaffolds. He opined Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl (R. 208). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 209-10). Dr. Lauderman found Plaintiff should avoid all exposure to hazards, should avoid concentrated exposure to extreme cold and heat, and could withstand unlimited exposure to

14

wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, and poor ventilation (R. 210). Dr. Lauderman reduced Plaintiff's RFC to sedentary exertional level (R. 211).

On October 7, 2003, Robert Marinelli, Ed.D., completed a Psychiatric Review Technique of Plaintiff. Mr. Marinelli found Plaintiff had impairments, namely affective disorders and anxiety-related disorders, which were not severe (R. 214). Mr. Marinelli found Plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace were mildly affected by her impairments. He noted Plaintiff had never experienced an episode of decompensation (R. 224).

On November 18, 2003, Plaintiff reported to the Appalachian Community Health Center for treatment of depression and anxiety (R. 239). Plaintiff was evaluated by Lisa Wamsley, B.S., of the Appalachian Community Health Center's admissions/crisis staff (R. 243). Plaintiff stated she had been diagnosed with fibromyalgia in 1999, had experienced symptoms "long before that," could not "sit, stand or lift" because of fibromyalgia, and was unable to work because she could no longer lift heavy objects and stand for extended periods of time (R. 241). Plaintiff stated she had been depressed for the past ten years and had been provided medication for depression by her physicians. Plaintiff reported her depression manifested itself as follows: her having 1) become "upset and tearful over little things"; 2) become "tearful watching television"; 3) poor concentration and memory; 4) loss of interest in hobbies and home life; 5) lack of interest in doing "things" with her children; 6) poor energy level; 7) feelings of guilty and worthlessness; 8) become more withdrawn in the past six (6) months; 9) increased need for sleeping and napping; 10) experienced an increase in anxiety attacks; 11) a fear of answering the telephone because she may miscommunicate or forget a message; 12) worried about her daughter having been diagnosed with schizophrenia; and 13) increased feelings of anger (R. 239-40).

15

Plaintiff informed Ms. Wamsley that she had worked as a certified nurse's assistant and licensed practical nurse until 2001, when she was fired from Colonial Place (R. 240). During her evaluation, Plaintiff maintained eye contact and was friendly. Plaintiff stated she slept approximately seven (7) hours per night, but, because of interruption to her sleep caused by pain, she actually slept three (3) hours. Plaintiff reported a good appetite; denied any suicidal or homicidal ideations, hallucinations, or delusions; described her mood as "usually depressed"; experienced feelings of dread; experienced poor short term memory; and possessed an in tact long term memory (R. 241-42). Ms. Wamsley noted Plaintiff's affect was flat (R. 242).

Ms. Wamsley diagnosed the following: 1) Axis I – major depressive disorder, recurrent without psychotic features (primary) and generalized anxiety disorder (secondary); 2) Axis IV – no social support; and 3) Axis V – GAF 55 (R. 242). Ms. Wamsley opined Plaintiff needed to "identify and learn appropriate ways to improve mood and decrease depressive episodes and follow through with doctor recommendations" (R. 243).

On February 10, 2004, Dilip Chandran, M.D., completed a Comprehensive Psychiatric Evaluation of Plaintiff. Plaintiff's chief complaint was depression. Plaintiff stated her depressive symptoms included "anergia, amotivation, crying spells, anhedonia, feelings of helplessness, hopelessness," and guilt. Plaintiff informed Dr. Chandran she had had "about four to five" panic attacks in the past year (R. 235). Plaintiff stated she was supported by her husband; her parents offered "good support to her"; and she was "supported by members of the church" (R. 236).

Dr. Chandran observed Plaintiff to be alert, oriented, in no acute distress, obese, hygienic, pleasant, and cooperative. He noted Plaintiff's speech was clear and coherent; she had not experienced hallucinations; her mood was depressed; her affect was downcast; her memory was intact; her

concentration was intact; and her insight and judgment were fair. Dr. Chandran assessed the following: 1) Axis I – major depressive disorder, moderate, recurrent; 2) Axis II – none; 3) Axis III – fibromyalgia, hypertension, osteoarthritis; 4) Axis IV – medical stressors and family members' illnesses; and 5) GAF – sixty (60) percent (R. 237). Dr. Chandran increased Plaintiff's dosage of Zoloft to 200mg, encouraged Plaintiff to continue with therapy, and instructed Plaintiff to return in one (1) month (R. 237-38).

On March 5, 2004, Dr. Corder made a notation on a prescription form that Plaintiff was unable to work (R. 245).

On March 9, 2004, Dr. Chandran evaluated Plaintiff. Plaintiff reported she was "seeing no improvement on the increased dose of Zoloft"; her mood continued as a one (1) on a scale of ten (10); she continued to be amotivational; her crying spells continued; she still had difficulty sleeping; her feelings of helplessness, hopelessness, and guilt continued; her appetite remained stable; and she experienced difficulty initiating and completing sustained or complex tasks. Dr. Chandran noted Plaintiff's mood was depressed and her affect was downcast. His assessment was as follows: 1) Axis I – major depressive disorder, moderate, recurrent; 2) Axis III – fibromyalgia, hypertension, and osteoarthritis (R. 232). Dr. Chandran prescribed Paxil, recommended Plaintiff seek therapy weekly, recommended Plaintiff volunteer "at a low stressful institution" as a way of providing "structure in her day and to keep her mind occupied," and instructed Plaintiff to return to his care in four (4) weeks (R. 233).

On May 18, 2004, Dr. Corder authored a letter, addressed "To Whom This May Concern," relative to Plaintiff's ability work. He wrote Plaintiff was "unable to work do to chronic pain and depression." Dr. Corder wrote Plaintiff had "multiple complaints" of severe depression since 1996,

she had experienced minimal positive results of the prescribed medications, and "it was impossible

for her to work very long has [sic] a nurse do to the stress of the job." Dr. Corder also wrote that

Plaintiff's chronic pain was caused by fibromyalgia, which responded minimally to injection and

medication. Dr. Corder listed Plaintiff's other illnesses as hypertension, morbid obesity, generalized

affective disorder, asthmatic bronchitis, and patellofemoral syndrome (R. 244).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 404.1520 (2000), ALJ Alexander made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant engaged in substantial gainful activity until June 28, 2001. She has not performed any substantial gainful activity since June 28, 2001.

3. The claimant's cervical and lumbar strain/sprain; moderate osteoarthritis of the left knee; and obesity are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: she is able to perform a range of light work; requires a sit/stand option; can perform all postural movements occasionally, except cannot kneel, crawl, or climb ladders, ropes, or scaffolds; should not do push/pull motions with the lower extremities; should not be exposed to temperature extremes; should work in low stress environment, with no production line type of pace and no independent decision making responsibilities; is limited to unskilled work involving routine and repetitive instructions and tasks; and should have no interaction with the general public.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

18

8.     The claimant is a "younger individual" (20 CFR § 404.1563).

9.     The claimant has "more than a high school education" (20 CFR § 404.1564).

10.    The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568).

11.    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as mail clerk, general office clerk, inspector, surveillance system monitor, bookkeeping/accounting clerk, and assembler.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(b) and (g)) (R. 24-25)

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than

a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred by failing to properly consider the treating source opinion.

2. The ALJ erred by failing to resolve any inconsistencies between the testimony of the Vocational Expert and the Dictionary of Occupational Titles before relying upon that testimony in his Decision.

3. The ALJ erred by failing to follow the appropriate procedure for evaluating credibility, as set forth in SSR 96-7p.

The Commissioner contends:

1. Substantial evidence supports the ALJ's finding that Dr. Corder's opinion was not entitled to significant weight.

2. The vocational expert's testimony was consistent with the Dictionary of Occupational Titles.

3. Substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible.

## C. Treating Physician

Plaintiff contends the ALJ erred by failing to properly consider the treating source opinion. Defendant contends substantial evidence supports the ALJ's finding that Dr. Corder's opinion was not entitled to significant weight.

SSR 96-2p mandates:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>> When the determination or decision:
>> is not fully favorable, e.g., is a denial; or
>> is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Additionally, the Fourth Circuit opined, in *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) that

"[a]lthough it is not binding on the Commissioner, a treating physician's opinion is entitled to great

weight and may be disregarded only if persuasive contradictory evidence exists to rebut it."

The ALJ, in his decision, made the following finding as to Plaintiff's treating physician:

> The claimant's treating family doctor is Dr. Corder. . . . With the exception of the blood pressure readings and weight reported on some examinations, these notes are almost completely illegible. The Administrative Law Judge has made a studied effort to make some sense out of these notes but has been unable to. This material can not be considered as evidence under these circumstances. The Administrative Law Judge has not been able to find any kind of imaging or other objective testing in Dr. Corder's records that would shed any light on the nature and severity of the claimant's alleged impairments. Therefore, his medical assessment dated July 24, 2003 . . . is not supported by anything that can be read and understood. The limitations in fact border on the ludicrous in view of the benign medical evidence of record and the lack of findings in Dr. Corder's own notes. The limitation to lifting five pounds occasionally and one pound frequently is totally unsupported by physical medical evidence. The doctor states that the claimant's hands are stiff and painful, of which there is no objective evidence. He states that the claimant has fibromyalgia, although it has already been established beyond doubt that the claimant does not have fibromyalgia. The Administrative Law Judge believes that Dr. Corder ought to be aware of the fact and believes that he is exaggerating the claimant's symptoms in an effort to help her in her attempt to obtain benefits (R. 21).

Dr. Corder has submitted more of the same at exhibit 17F. The extremely subjective nature of this entire process is illustrated by the first sentence in the statement of Dr. Corder dated May 18, 2004. He states, "Patient states she is unable to work due to chronic pain and depression (emphasis added)." The Administrative Law Judge notes that it is an unusual medical system in which the claimant decides what her physical limitations are, with no supporting evidence. The Administrative Law Judge further notes that Dr. Corder writes as though he were illiterate. This does not inspire a great deal of confidence in the Administrative Law Judge regarding Dr. Corder's reliability or credibility. He also comments on mental impairments, an area in which he has no expertise. Given the lack of support for these opinions, the Administrative law Judge gives no weight whatever to Dr. Corder's pronouncements (R. 22).

The ALJ has a duty to review, consider, and evaluate the evidence provided – in whatever format – by Plaintiff's treating physician and to give "specific reasons" why those opinions were or were not afforded weight. The ALJ did note in his decision that Dr. Corder's opinion that Plaintiff was limited to "lift five pounds occasionally and one pound frequently [was] totally unsupported by physical medical evidence"; that Plaintiff's complaints of hand stiffness and pain was supported by "no objective evidence"; that Dr. Corder stated that Plaintiff had fibromyalgia, "although it has . . . been established beyond doubt that the claimant does not have fibromyalgia"; and that Dr. Corder commented on Plaintiff's "mental impairments, an area in which he has no expertise" (R. 21-22). The undersigned finds these assessments comport with the mandates of SSR 96-2p. The undersigned finds, however, that the subsequent specific reasons listed by the ALJ for giving "no weight whatever to Dr. Corder's pronouncements" do not comply with SSR 96-2p.

As noted above, the ALJ, in his decision, discounted the opinions of Plaintiff's treating physician because he found Dr. Corder's treatment notes to be "almost completely illegible." Based on the ALJ's inability to "make some sense out of [Dr. Corder's] notes," he found that "material" could not be "considered as evidence" (R. 21). Additionally, the ALJ discounted Dr. Corder's July

22

24, 2003, Medical Assessment of Ability to do Work-Related Activities (Physical) of Plaintiff because he found it was "not supported by anything that can be read and understood" (R. 21). The ALJ further decided what weight to give the opinions of Dr. Corder based on his opinion that "Dr. Corder writes as though he were illiterate," which did not "inspire a great deal of confidence in the Administrative Law Judge regarding Dr. Corder's reliability or credibility" (R. 21-22). The rules and regulations do not provide that the poor quality of a doctor's handwriting and the assumption of the ALJ caused thereby that the doctor may be "illiterate" constitute "persuasive contradictory evidence" to rebut that doctor's opinions. *Craig, supra.* The ALJ relied on this assessment of the legibility condition of the evidence provided by Dr. Corder instead of assessing whether Dr. Corder's opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with the other substantial evidence of record.

SSR 96-5p requires the following: "Because treating source evidence (including opinion evidence) is important, if . . . the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." The ALJ, in the instant case, was unable to "ascertain the basis of [Dr. Corder's] . . . opinion from the case record" because he found Dr. Corder's handwriting to be illegible. It was, therefore, his duty to "recontact" the treating physician for clarification of his treatment notes relative to his care of Plaintiff. In not doing so, the ALJ erred. The undersigned finds, therefore, that the ALJ's decision to provide "no weight whatever" to the opinions of Plaintiff's treating physician was not supported by substantial evidence of record (R. 22).

### D. Vocational Expert

Plaintiff contends the ALJ erred by failing to resolve any inconsistencies between the

testimony of the Vocational Expert and the Dictionary of Occupational Titles before relying upon

that testimony in formulating his Decision. Defendant contends the VE's testimony was consistent

with the DOT. Plaintiff asserts, in her brief, that the VE failed to identify specific jobs that the

Plaintiff was able to perform and that inconsistencies exist between the ALJ's hypothetical and the

jobs named by the VE (Plaintiff's brief at pp. 10-11).

SSR 00-4p mandates, in part, the following:

PURPOSE: This Ruling clarifies our standards for the use of vocational experts
(VEs) who provide evidence at hearings before administrative law judges (ALJs),
vocational specialists (VSs) who provide evidence to disability determination
services (DDS) adjudicators, and other reliable sources of occupational information
in the evaluation of disability claims. In particular, this ruling emphasizes that before
relying on VE or VS evidence to support a disability determination or decision, our
adjudicators must: Identify and obtain a reasonable explanation for any conflicts
between occupational evidence provided by VEs or VSs and information in the
Dictionary of Occupational Titles (DOT), . . . and explain in the determination or
decision how any conflict that has been identified was resolved.

Questions have arisen about how we ensure that conflicts between occupational
evidence provided by a VE or a VS and information in the DOT . . . are resolved.
Therefore, we are issuing this ruling to clarify our standards for identifying and
resolving such conflicts.

Occupational evidence provided by a VE or VS generally should be consistent with
the occupational information supplied by the DOT. When there is an apparent
unresolved conflict between VE or VS evidence and the DOT, the adjudicator must
elicit a reasonable explanation for the conflict before relying on the VE or VS
evidence to support a determination or decision about whether the claimant is
disabled. At the hearings level, as part of the adjudicator's duty to fully develop the
record, the adjudicator will inquire, on the record, as to whether or not there is such
consistency.

When a VE or VS provides evidence about the requirements of a job or occupation,
the adjudicator has an affirmative responsibility to ask about any possible conflict
between that VE or VS evidence and information provided in the DOT. In these
situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information

24

in the DOT; and

> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

At the administrative hearing, the following question/answer exchange occurred between the

ALJ and the VE:

ALJ: ... [A]ssume a hypothetical individual the Claimant's age, educational background and work history who would be able to perform a range of light work. Would require a sit stand option. Could perform all postural movements occasionally except could not climb ladders, ropes, or scaffolds. And would not be able to kneel or crawl. Should have no – should not be required to do any push, pull motions with the lower extremities. Should not be exposed to temperature extremes. Should work in a low stress environment with no production line type of pace or independent decision-making responsibilities. Would be limited at this point to unskilled work and should not have interaction with the general public. Would there be any work in the regional or national economy that this person could perform? (R. 273).

VE: Yes, Your Honor, . . . . There would be the work of interviewer. . . (R. 273).

ALJ: Would the interview job involve interaction with the public? (R. 273).

VE: Yes, Your Honor. You didn't have that as part of the – (R. 273).

ALJ: I think that was the last thing I said (R. 274).

VE: Hypothetical, unskilled, okay (R. 274).

ALJ: No interaction with the general public (R. 274).

VE: Excuse me. Yes, that job would not be appropriate. There would be work of a mail clerk. That would be working in private industry as opposed to working for the postal service and there would be 85 jobs in the local economy and 79,258 in the national economy. There would be the work of a general office clerk. In the local economy there are 181 jobs, in the national economy 165,819 jobs. There would be the work of an inspector. In the local economy there are 131 jobs, in the national economy 140,749 jobs (R. 274).

ALJ: And if you would reduce the exertional level to sedentary and retaining the other limitations would there be anything that would accommodate that? (R. 274).

VE: There would be the work of a surveillance system monitor. In the local economy there are 13 jobs, in the national economy 12,947 jobs. There wold be the work of a bookkeeper

accounting clerk. In the local economy there are 62 jobs, in the national economy 71,090 jobs. There would be the work of an assembler. In the local economy there are 35 jobs, in the national economy 54,794 jobs (R. 274).

ALJ:   And does anything in your testimony – has anything in your testimony been inconsistent with anything in the DOT? (R. 274).

VE:   No, Your Honor (R. 274).

As this questioning by the ALJ and testimony of the VE demonstrate, the ALJ attempted to identify any conflict between the VE's testimony and the information contained in the DOT in conformance with the aforementioned mandates of SSR 00-4p. Plaintiff's assertion that the ALJ erred because he relied on the VE's testimony, which provided non-specific job listings, such as "inspector" with 741 different occupations, skill levels, and exertional levels, and "assembler," with 604 different positions, skill levels, and exertional levels, is not accepted by the undersigned (Plaintiff's brief at pp. 10-11). SSR 00-4p states, in part, that "[t]he DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs." The VE listed occupations, which "represents numerous jobs," and not specific jobs which could be performed by Plaintiff based on the ALJ's hypothetical question, as permitted by SSR 00-4p.

The undersigned has considered the assertions of Plaintiff in light of the language found in SSR 00-4p and finds the ALJ correctly applied SSR 00-4p in that he, even after the one apparent conflict between the testimony of the VE and the DOT was resolved by the ALJ at the administrative hearing and no other "apparent" conflicts were evident, inquired of the VE as to any such conflict. Additionally, the undersigned finds the ALJ was correct in his accepting the VE's answer to the hypothetical question as to what jobs existed which could be performed by Plaintiff because the

26

occupations listed in the DOT, and to which the VE referred, are "collective" descriptions of occupations and not specific jobs. The VE's testimony was, therefore, sufficient.

Similarly, there is no apparent conflict between the ALJ's hypothetical question and the VE's testimony that Plaintiff could perform the jobs of accounting clerk, general office clerk, mail clerk and many of the assembler jobs. Plaintiff asserted she was precluded from jobs that required "production line type of pace," a limitation which the ALJ included in his hypothetical, but that the occupations of accounting clerk, general office clerk, mail clerk, but that some assembler jobs required the attainment of "precise set limits" (Plaintiff's brief at p. 11). The ALJ, by asking the VE if his responses were consistent with the DOT, and the VE, in responding in the affirmative, fulfilled their obligations as to the resolution of apparent conflicts.

Additionally, Plaintiff asserted the ALJ erred in relying on the VE's naming surveillance system monitor as a job she could perform because it involved interaction with people, something which was precluded by the ALJ in his hypothetical. Defendant asserts, in her brief, that "the surveillance system monitor job was described in response to a hypothetical question involving a limitation to sedentary work" (Defendant's brief at p. 11). The undersigned finds Defendant's assertion is supported by the record of evidence. In response to the ALJ's hypothetical question that reduced Plaintiff's exertional level to sedentary and retained the other limitations, the VE listed three jobs, one of which was surveillance system monitor (R. 274). In his decision, the ALJ found Plaintiff's RFC to be for a "significant range of light work" and relied on the testimony of the VE as to light jobs available to the Plaintiff (R. 23). The undersigned finds, therefore, that the naming by the VE of surveillance system monitor as a sedentary job Plaintiff could perform was harmless error because Plaintiff's RFC was for light, and the ALJ relied on the light jobs listed by the VE in

determining there was work available to Plaintiff in the regional and national economies.

The undersigned finds the ALJ's reliance on the VE's testimony is not reversible error because the VE offered jobs which were composites of jobs which Plaintiff could perform; the ALJ inquired as to any conflicts between the VE and the DOT in accordance with the mandates of SSR 00-4p; the ALJ relied on the light jobs named by the VE, which could be performed by Plaintiff, not the sedentary jobs, of which surveillance system monitor was one, in determining there were jobs in the regional and national economies Plaintiff could perform; and substantial evidence supports the decision by the ALJ.

### E. Credibility

Plaintiff contends the ALJ erred by failing to follow the appropriate procedure for evaluating credibility, as set forth in SSR 96-7p. Defendant contends substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible.

SSR 96-7p reads, in part, as follows:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:
>
> > 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.
> >
> > 2. When the existence of a medically determinable physical

28

or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

In his decision, the ALJ made the following findings:

The medical evidence establishes that the claimant has cervical and lumbar strain/sprain; moderate osteoarthritis of the left knee; and obesity, impairments that are "severe" within the meaning of the Regulations (R. 16).

. . . [C]laimant testified that her hypertension was occasionally not controlled with prescribed medication (R. 17).

The claimant testified that as a result of her fibromyalgia she is bothered by pain in her back, legs, and upper extremities. She complained of nausea with prolonged standing and testified that she sweats profusely due to her pain and prescribed medication. She complained of back pain, located in the small of her back, after standing for 10 to 15 minutes. She complained of swelling in her hands, legs and feet. She testified that she takes Lasix for the swelling and that for the first four hours after taking the medication she must go to the bathroom every 15 minutes. The claimant testified that she can lift five pounds and that she is bothered by neck and back pain after sitting for 30 minutes. Her sleep is disturbed by her constant pain and she continues to have problems sleeping despite taking prescribed medication. She testified that she must nap for a period of one hour three times a day. The claimant testified that she had fallen frequently while walking during the past week. The claimant complained of constant pain in her knees, worse on the left side, secondary to osteoarthritis. Her pain in the knees is increased by walking (R. 19).

The claimant testified her depression results in an inability to concentrate and causes her mind to wander. She complained of frequent crying spells and testified that she feels really bad because she can no longer work as a nurse. She testified that she does not sleep well as a result of her depression (R. 19).

The claimant . . . [was] not entirely credible, based on some of the claimant's statements and other evidence of record. The Administrative law Judge believes that the claimant is grossly exaggerating her physical symptoms and limitations. The objective medical evidence is so benign that one can only conclude that the claimant is substantially exaggerating her symptoms. As stated above, in December 1999 the claimant's doctor stated that there were insufficient physical findings to support a diagnosis of fibromyalgia. One can only believe that she told the claimant so. Nevertheless, the claimant insists on going around telling everyone that she has fibromyalgia, when she knows or certainly should know that that is not the case. For example, she told the psychological evaluator on April 28, 2003, that she was unable to walk long distances due to fibromyalgia (Exhibit 4F). The claimant also told the physical consultative examiner, Dr. Beard, that she had fibromyalgia (Exhibit 5F). When seen at the mental health center on November 18, 2003, the claimant once again repeated the story that she had fibromyalgia which caused her significant limitations. On February 17, 2004, she reported that her fibromyalgia prevented her from returning to work (Exhibit 16F). This type of exaggeration undermines the claimant's credibility significantly in the Administrative Law Judge's opinion (r. 19-20).

The claimant reports that she naps three times during the day due to extreme fatigue. However, she has no condition that could reasonably be expected to cause fatigue to that drastic extent. She has certainly not been diagnosed with any sort of fatigue syndrome. She states that she can lift no more than five pounds, which is not

credible on its face in view of the extremely mild objective physical findings. She testifies that she gets swelling in her hands, legs and feet, but there does not appear to be any record of her mentioning this to any doctor or of any doctor so finding. She stated that she falls frequently, but again she has no condition that would be expected to cause frequent falling and once more there does not appear to be any reports of such occurrences in the treatment notes or hospital records (20).

For all the foregoing reasons, the Administrative Law Judge does not find the claimant . . . to be entirely credible and does not accept [her] statements concerning the claimant's symptoms and limitations, including, but not limited to, fibromyalgia, left heel spur, carpal tunnel syndrome, uncontrolled hypertension, and depression. The claimant has medically determinable impairments that could reasonably be expected to cause some of the symptoms described, and the Administrative Law Judge believes that the claimant does experience neck, back, and knee pain from time to time, but not to the frequency and severity alleged. In view of this finding concerning the claimant's credibility, the Administrative Law Judge does not accept medical findings or opinions that are based solely or primarily on the claimant's subjective complaints (R. 20).

The ALJ found that some of Plaintiff's impairments could reasonably be expected to produce her symptoms. Specifically, he found her neck, back and knee pain could cause some of the symptoms of which Plaintiff complained "from time to time," but not as frequently and severely as she alleged (R. 20). The ALJ, however, did not find Plaintiff credible as to the existence of her symptoms of and limitations caused by fibromyalgia, left heel spur, carpal tunnel syndrome, uncontrolled hypertension, and depression and well as falling and swelling because they were inconsistent with Plaintiff's activities of daily living and the medical findings and/or medical opinions of these impairments were "based solely or primarily on the claimant's subjective complaints" (R. 20).

The undersigned finds the ALJ's decision relative to Plaintiff's fibromyalgia, carpal tunnel syndrome, hypertension, left heel spur, depression, and falling was supported by the objective medical evidence of record. In December, 1999, Dr. Hornsby noted she could not "make a diagnosis of fibromyalgia," even though Plaintiff did not sleep well and presented with "a few tender

31

points" (R. 16, 123). After that non-diagnosis, Dr. Corder noted on October 26, 2000, March 30, 2001, January 15, 2003, July 24, 2003, August 20, 2003, and May 18, 2004, that Plaintiff suffered with fibromyalgia (R. 198, 197, 191, 189, 244). There was no medical or laboratory finding in the record of evidence to support this assessment by Dr. Corder. Additionally, as noted by the ALJ, Plaintiff reported that she had been diagnosed with fibromyalgia to the following physicians and medical personnel: 1) Dr. Joseph on April 28, 2003; 2) Dr. Beard on May 7, 2003; 3) Ms. Wamsley on November 18, 2003, and 4) Dr. Chandran on February 10, 2004 (R. 139, 144, 241, 236). There was no medical or laboratory finding reviewed by any of these physicians to confirm Plaintiff did have fibromyalgia; therefore, the ALJ's findings that "no . . . evidence in the record upon which to base a proper diagnosis of fibromyalgia, i.e. no doctor has identified eleven of the eighteen specified tender points necessary for a diagnosis of fibromyalgia" and there was "no supportable diagnosis of fibromyalgia in this record" were correct and were supported by substantial evidence (R. 16).

Additionally, the evidence of record supported the ALJ's finding that Plaintiff was not entirely credible as to her symptoms and limitations due to carpal tunnel syndrome. The ALJ found that, based on a "review of the medical records," Plaintiff "had diagnostic studies in April 1996 that revealed findings consistent with mild right carpal tunnel syndrome. . . . Nevertheless, she continued to work for two years and left only because she was replaced" (R. 20). Dr. Swisher, who completed the April 8, 1996, electromyography and nerve conduction study of Plaintiff, opined that the results of those tests were "consistent with mild right sided carpal tunnel syndrome" (R. 16, 121). In an April 11, 1996, letter from Dr. Swisher to Dr. Corder, Dr. Swisher noted Plaintiff had numbness and tingling in her hands, had decreased grip strength, and had borderline nerve conduction study results and recommended "conservative treatment with a splint" for carpal tunnel

syndrome (R. 16, 120). The record of evidence also showed that on July 7, 1999, Plaintiff informed Joseph Steffl, Physician Assistant to Dr. Corder, that she was experiencing weakness within her hands, but that she was pain free and not experiencing any difficulties with her hands. P.A. Steffl diagnosed possible continuation of carpal tunnel (R. 203). There is no evidence of record that Plaintiff ever sought or received treatment for carpal tunnel syndrome. As the ALJ stated in his decision, Plaintiff "has failed to document any treatment for carpal tunnel syndrome since June 28, 2001" (R. 16). The evidence of record revealed that on May 7, 2003, Dr. Beard opined Plaintiff's hands were normal in that she could "button and pick up coins with either hand and write with the dominant hand" and that her grip strength measured "70, 70, and 50 pounds of force on the right and 40, 40 and 40 pounds of force on the left"; on May 22, 2003, Dr. Franyutti opined Plaintiff had no manipulative limitations; and on October 3, 2003, Dr. Lauderman opined Plaintiff had no manipulative limitations (R. 16, 145, 168, 209). There is substantial evidence of record which supports the ALJ's finding that Plaintiff was not entirely credible relative to her symptoms and limitations caused by carpal tunnel syndrome.

In assessing Plaintiff's asserted symptoms and limitations caused by hypertension, the ALJ found the "record fails to establish any period which has lasted or can be expected to last for a continuous period of at least 12 consecutive months during which the claimant . . . has had a significant limitation associated with her hypertension" (R. 17). The undersigned agrees. Dr. Corder diagnosed Plaintiff with hypertension on June 26, 2001, when her blood pressure was noted as 160/102 (R. 196). On August 20, 2001, Dr. Corder noted Plaintiff's blood pressure was 158/100 and diagnosed Plaintiff with uncontrolled hypertension (R. 194). On September 5, 2001, Plaintiff's blood pressure was documented as 160/80 and Dr. Corder again diagnosed her with uncontrolled

hypertension (R. 194). Plaintiff was diagnosed with borderline controlled hypertension by Dr. Corder on October 19, 2001, and hypertension on January 15, 2003, by Dr. Corder (R. 193, 191). The ALJ noted, in his decision, that Plaintiff's" hypertension was controlled with prescribed medication during a majority of the period in question" and the evidence of record supports this finding (R. 17). The ALJ's finding, therefore, that Plaintiff was not entirely credible about her symptoms and limitations caused by hypertension is supported by substantial evidence.

Likewise, the ALJ adequately reviewed and evaluated the evidence of record relative to Plaintiff's assertion that a left heel spur was one of her impairments. The ALJ found Plaintiff "failed to submit any medical evidence to establish a medically determinable impairment related to the alleged left foot heel spur" (R. 17). The evidence of record revealed that on June 26, 2001, Plaintiff reported to Dr. Corder that she had been x-rayed at the Tucker County Ambulatory Center and the x-ray revealed a bone spur (R. 196). The x-ray taken at the Tucker County Ambulatory Center was not produced as evidence to confirm Plaintiff's assertion that she had been diagnosed with a bone spur. The only other evidence of record as to Plaintiff's heel condition was the May 7, 2003, opinion of Dr. Beard, which was that Plaintiff could heel walk with pain, toe walk, and heel-to-toe walk (R. 17, 145). In light of the absence of evidence to support Plaintiff's assertions that she experienced symptoms and limitations from a left heel spur, the decision of the ALJ is supported by substantial evidence.

In assessing Plaintiff's credibility relative to her asserted symptoms and limitations caused by depression, the ALJ found the following:

> The Administrative Law Judge . . . does not believe that the claimant has established the presence of a severe mental impairment. The claimant had a consultative psychological evaluation on April 28, 2003. Following the evaluation, the evaluator

diagnosed major depression and pain disorder, obviously based entirely on the claimant's subjective statements. In this regard, mental status examination revealed that the claimant's concentration was only mildly impaired, immediate memory was within normal limits, recent memory was moderately impaired (two of four words after 30 minutes), and remote memory was within normal limits. The claimant was alert, fully oriented, and cooperative (Exhibit 4F). The claimant has no history of regular mental health treatment prior to her going to Appalachian Community Health Center on November 18, 2003. Diagnoses on that date were major depressive disorder and generalized anxiety disorder. Her Global Assessment of Functioning (GAF) was rated at 55, or a moderate impairment according to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Fourth Edition, page 32 or Page 34 in the Revised Text (DSM-IV). The claimant saw a psychiatrist at the mental health center on February 10, 2004. He noted that the claimant was alert and oriented; very pleasant and cooperative; and her memory was intact. He diagnosed major depressive disorder, moderate, with a GAF of 60 (Exhibit 16F) (R. 17).

There is really no other evidence relating to the claimant's mental impairments or limitations. The Administrative Law Judge does not believe that the above findings, together with GAF scores of 55 and 60, support a severe mental impairment. The Administrative Law Judge agrees with the assessment submitted by the state agency psychological consultant (Exhibit 14F) finding that the functional limitations associated with the claimant's mental impairments, when evaluated under the "B" and "C" criteria, are not of a level of severity to establish the presence of a severe impairment. In this regard, the activities that the claimant reported to the consultative evaluator (Exhibit 4F), [inability to concentrate, mind wanders, frequent crying spells (R. 19)] are consistent with a finding of no more than a mild restriction of activities of daily living. The claimant's attendance of church three to four times a week, helping with church activities, and attendance of band concerts (Exhibit 16F), are indicative of no more than mild difficulties in maintaining social functioning. As noted above her concentration was only mildly impaired at the time of the consultative evaluation (Exhibit 4F). The record supports a finding that she has mild difficulties in maintaining concentration, persistence, and pace. Further, she has failed to document any episodes of decompensation (R. 18).

As the claimant has failed to establish that her affective disorder satisfies the "B" criteria of Section 12.04, the Administrative Law Judge must further evaluate this condition under the "C" criteria. As outlined above, her condition has not resulted in repeated episodes of decompensation. Further, the evidence fails to establish a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate. Finally, she has no history of one or more years of inability to function outside a highly supportive living arrangement. She does not satisfy the "C" criteria of Section 12.04. The record further fails to establish that the claimant satisfies the "C" criteria of Section 12.06 of Appendix 1.

Her anxiety-related disorder has not resulted in a complete inability to function outside the area of her home (R. 18).

Based on the April 28, 2003, consultative psychological evaluation; the Psychiatric Review Technique evaluation conducted by a state-agency physician on October 7, 2003; the treatment at the Appalachian Community Health Center, which commenced on November 18, 2003; and the February 10, 2004, mental evaluation by Dr. Chandran, the ALJ found Plaintiff did not establish "the presence of a severe mental impairment" (R. 17). The ALJ accurately noted Plaintiff had "no history of regular mental health treatment prior" to November 18, 2003, and there was "really no other evidence relating to the claimant's mental impairments or limitations" (R. 17). The evidence of record revealed the following: 1) Plaintiff complained of being depressed to Dr. Swisher on April 11, 1996 (R. 120); 2) on August 3, 1998, Plaintiff complained of having difficulty concentrating at her job during an evaluation at UHA (R. 133); 3) Plaintiff complained of being depressed to Dr. Corder on July 20, 2001 (R. 196); 4) Dr. Corder had Plaintiff complete an in-office mental health screen on July 20, 2001 (R. 195); 5) Dr. Corder prescribed anti-depression drugs to Plaintiff beginning on July 20, 2001, through December 14, 2001 (R. 193, 194, 196); and 6) the May 13, 2003, opinion of Mr. Frank D. Roman that Plaintiff was depressed, which mildly limited her activities of daily living, ability to maintain social functioning and ability to maintain concentration, persistence, or pace, and had no episodes of decompensation (R. 151, 158). The ALJ's finding that the evidence of record contained no proof of regular mental health treatment prior to November, 2003, is supported by Plaintiff's one complaint of depression in 1996, one complaint of depression in 1998, a complaint of depression in 2001 with a six-month medication treatment regimen, and a diagnosis of depression which caused mild limitations but no decompensation. The ALJ was also correct in his finding that the evidence of record contained no other objective medical evidence to

support the symptoms and limitations the Plaintiff claimed she experienced because of mental impairment or limitations (R. 17). As noted by the ALJ, the finding of the state agency psychological consultant that Plaintiff did not have a severe mental impairment was substantial evidence to support his finding. The ALJ reviewed the statements of Plaintiff as to activities of daily living, specifically that she attended church three or four times per week, helped with church activities, attended her children's band concerts as well as rose at 6:45 a.m, readied and took her children to school, cleaned the house, made beds, ran vacuum (with frequent rests), cleaned bathroom, did laundry, cooked meals, washed dishes, and spent time with her family, and determined these activities were " indicative of no more than mild difficulties in maintaining social functioning" (R. 17-18, 20). His finding, therefore, that Plaintiff had "mild difficulties in maintaining concentration, persistence, and pace" and "no episodes of decompensation" is supported by the objective medical evidence of record, the opinions of psychologists and psychiatrists, and the statements of Plaintiff (R. 18).

In assessing Plaintiff's credibility relative to her asserted symptoms and limitations caused by falling, the ALJ stated the following in his decision: "She stated that she falls frequently, but . . . she has no condition that would be expected to cause frequent falling and once more there does not appear to be any reports of such occurrences in the treatment notes or hospital records" (R. 20). The record contained two claims by the Plaintiff that she fell. On August 3, 1998, Plaintiff reported to the neurology department at the Physician's Office Center at University Health Associates that she had "'stumbling problems' that caused her to change shoes" (R. 133). On December 6, 1999, Plaintiff listed "stumble occ. for no reason" as a medical problem during a physical examination at the Physician's Office Center at University Health Associates (R. 126). There was only one notation

by a doctor that Plaintiff fell. In his July 24, 2003, Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Corder opined that Plaintiff was limited in her lifting and carrying because her "knees give out & falls" (R. 184). Plaintiff's falling condition is based on her statements in 1998 and 1999 and not supported by any diagnosis by any physician – examining, treating, or consultative – of any condition that would result in Plaintiff's falling; therefore, there is substantial evidence to support the finding of the ALJ that Plaintiff is not entirely credible about the symptoms and limitations she experienced due to her falling (R. 20)

In assessing Plaintiff's credibility relative to her asserted symptoms and limitations caused by swelling, the ALJ made the following finding: Plaintiff testified "that she gets swelling in her hands, legs and feet, but there does not appear to be any record of her mentioning this to any doctor or of any doctor so finding" (R. 20). The undersigned finds, however, that a medical/laboratory finding relative to swelling/edema, diagnoses of edema by Dr. Corder, and Plaintiff's complaints of swelling to physicians were found in the evidence of record and should have been examined and evaluated by the ALJ. On March 12, 1998, Plaintiff underwent a venogram (unilateral left), which resulted in a diagnosis of edema/left knee swelling even though Plaintiff's "deep venous system [was] patent and no DVT [was] seen" (R. 118). Although Dr. Hornsby and Dr. Beard did not observe any swelling when they examined Plaintiff on December 6, 1999, and May 7, 2003, respectively, Dr. Corder observed "slight calf edema" on March 16, 2001, and "bilateral leg edema" on June 26, 2001 (R. 124, 144-45, 196, 197). Additionally, Dr. Corder noted, on the Medical Assessment of Ability to do Work-Related Activities, which he completed for Plaintiff on July 24, 2003, that Plaintiff's work-related activities were affected by her "legs swelling" (R. 186). In addition to the medical/laboratory finding of edema and left knee swelling and the diagnoses of Dr.

38

Corder, the record contains evidence that Plaintiff complained of swelling to the doctors and medical personnel who treated her. On February 6, 1999, Plaintiff informed the physician at University Health Associates that she experienced "occasional knee swelling"; on October 13, 1999, Plaintiff complained of "some swelling" to Dr. Corder; on June 26, 2001, Plaintiff presented to Dr. Corder with leg swelling; and on April 28, 2003, Plaintiff informed Ms. Joseph that arthritis caused swelling in her back and legs (R. 126, 201, 196, 139). The venogram for knee swelling, the diagnoses of swelling by Dr. Corder, and the complaints of swelling to doctors and medical personnel by Plaintiff contradict the ALJ's finding that "there does not appear to be any record of her mentioning this to any doctor or of any doctor so finding" (R. 20). The undersigned finds that the ALJ's finding relative to Plaintiff's credibility as to her symptoms and limitations caused by swelling is not supported by substantial evidence.

The undersigned, therefore, finds the following: The ALJ's credibility analysis of Plaintiff's symptoms and limitations due to her alleged impairments of fibromyalgia, left heel spur, carpal tunnel syndrome, uncontrolled hypertension, depression, and falling conforms with the mandates of SSR 96-7p in that he properly considered the entire case record, including the objective medical evidence, the individual's own statements about symptoms, and the statements and other information provided by treating or examining physicians or psychologists; there was substantial evidence of record to support the ALJ's findings as to Plaintiff's credibility relative to fibromyalgia, left heel spur, carpal tunnel syndrome, uncontrolled hypertension, depression, and falling; the ALJ's credibility analysis of Plaintiff's symptoms and limitations due to her alleged swelling impairment does not conform with the mandates of SSR 96-7p because he did not properly consider the entire case record; and substantial evidence does not support the ALJ's finding as to Plaintiff's credibility

relative to swelling.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 7 day of December, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE